Robert G. FOWLER and Sharon K. Fowler, Plaintiffs,

v.

UNITED STATES of America, acting Through the INTERNAL REVENUE SERVICE, Defendant.

UNITED STATES of America, Third-party Plaintiff,

v.

Danny R. HARMAN, Third-party Defendant.

No. 92–CV–0091–B.

United States District Court, D. Wyoming.

May 3, 1993.

Georg Jensen, Cheyenne, WY, for plaintiffs.

William F. Colgin, Dept. of Justice, Tax Div., Washington, DC, Donald R. Wrobetz, Asst. U.S. Atty., U.S. Atty. Dist. of WY, Cheyenne, WY, for defendant.

Lee Karavitis, Casper, WY, for third-party defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIMMER, District Judge.

The above-captioned matter having been tried before the Honorable Clarence A. Brimmer, from Monday, March 29, 1993 through Wednesday, March 31, 1993, and the Court having reviewed the materials on file herein, having heard argument from the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

### Background

Plaintiffs Robert G. Fowler and Sharon K. Fowler initiated this refund suit to recover overpayments credited to a tax liability assessed against Robert G. Fowler as a responsible person for taxes owed by CTD, Inc. pursuant to 26 U.S.C. § 6672. The Internal Revenue Service also assessed said tax liability against third-party defendant Danny R. Harman. The total tax liability was $11,-286.80. Should the Court find that plaintiffs are entitled to a refund, the United States seeks judgment against third-party defendant Harman.

### Findings of Fact

**A. The Parties.**

1. Robert G. Fowler and Sharon K. Fowler are plaintiffs, husband and wife residing in Natrona County, Wyoming.

2. The United States of America is defendant and third-party plaintiff, acting by and through the Internal Revenue Service ("IRS").

3. Danny R. Harman is a third-party defendant.

**B. The Initial Assessment.**

4. A delegate of the Secretary of the Treasury assessed Robert G. Fowler and Dan Harman in the amount of $11,286.80 pursuant to 26 U.S.C. § 6672 as persons required to collect, truthfully account for, and pay over taxes withheld by CTD, Inc.; and, as persons who willfully failed to do so during the quarters ending June 30, September 30, and December 31, 1983.

**C. Plaintiff Robert G. Fowler.**

5. During the periods at issue, Robert G. Fowler was the Chairman of the Board and President of CTD, Inc.'s ("CTD") parent company Extractive Fuels, Inc. ("EF"). Fowler was also Chairman of the Board and President of EF's primary shareholder, Dakota Minerals, Inc. ("DM"). Fowler was not an officer in CTD.

6. EF acquired CTD in a stock-for-stock transaction sometime in the early 1980s.

7. DM, EF, CTD and another related company called Viable Resources ("VR") had offices together on the same floor in the First National Bank Building in Casper, Wyoming. Each company had a separate, closed office which opened up into a common area. Secretaries would assist with the activities of all four corporations.

8. Richard Rowlette ("Rowlette") was the Chairman of the Board and president of CTD. Rowlette was one of only two people who could sign CTD's corporate checks. Fowler did not have signatory authority on the CTD account. (Gov't's Exh. A). Rowlette signed CTD's quarterly federal tax returns for the periods in issue. (Gov't's Exh. D, E and F).

9. Fowler frequently arranged cash advances for CTD from DM and EF, although DM and EF were not CTD's exclusive source of financing. CTD has loans outstanding with the First Bank of Glenrock. CTD relied on these advances because it was primarily a research and development corporation whose principal assets were its people and its ideas.

10. The manner in which cash would flow from DM or EF to CTD was as follows: On various occasions, sometimes as often as once a week, Rowlette would orally present to Fowler, a Mr. Zenith Merritt (president of VR) and others the projects Rowlette was working on and the funds required for those projects. Fowler and Merritt, and sometimes others, would consult regarding Rowlette's presentation, and then arrange for cash advances accordingly. Fowler and Merritt did not direct Rowlette regarding exactly how to spend these cash advances, although it was implicitly agreed that the money would be spent in accordance with what the three men discussed in their meetings.

11. Fowler reviewed CTD's financial status about once a month as part of his duties as CEO and president of CTD's parent company, EF. Initially, Fowler believed that Rowlette had the ability to properly manage the financial affairs of CTD.

12. In late 1982, about three to four months after Rowlette started working as head of CTD, Rowlette began to conduct his affairs behind closed doors. Rowlette had a severe drinking problem which affected his work performance. Rowlette's drinking tended to aggravate his already strong personality resulting at times in violence and belligerence. Over time, Rowlette's belligerence hampered the otherwise good communications between Fowler, Rowlette, Merritt and Danny Harman. Fowler's professional relationship with Rowlette steadily deteriorated beginning in the summer of 1983 and continuing through the tax periods in question.

13. Fowler first became aware that CTD was having trouble paying its corporate payroll taxes in late 1983. Danny Harman, the controller, brought the problem to Fowler's attention. Fowler authorized that EF advance two sums to CTD to help CTD pay its corporate taxes: a sum of $8,500 in November 1983, and a sum of $15,000 in December 1983. (Plaintiffs' Exh. 12). Fowler believed that Rowlette would pay the corporate payroll taxes owing for CTD's second quarter given these cash advances.

14. In February 1984, Harman and Merritt met with an IRS agent to discuss CTD's continuing tax problem. By this time, CTD's tax deficiencies could be characterized as severe. Harman and Merritt met with Fowler subsequent to their meeting with the IRS agent. Also by this time, Fowler's relationship with Rowlette had deteriorated completely, as had Rowlette's relationship with just about everyone else in the adjoining offices. In February 1984, Fowler for the first time took aggressive, active steps to try to pay off CTD's payroll taxes. After the IRS agent had met with Harman and Merritt, and after consulting with Harman and Merritt regarding the meeting, Fowler knew that the monies he had advanced CTD had not been used properly to pay the taxes owing. (Gov't's Exh. B at 13–16).

## D. Third-party defendant Danny R. Harman.

15. During the periods at issue, Danny R. Harman was a certified public accountant and treasurer/controller of CTD. Harman was also secretary and treasurer for DM and EF, and treasurer for VR. As treasurer for CTD, his responsibilities included maintaining the company's financial records. (3–Party Defendant's Exh. A1). Harman had physical control of CTD's checkbook from time to time, and had signature authority on CTD's corporate account. Harman reported directly to Rowlette. (3–Party Defendant's Exh. A1).

16. Harman most likely prepared the corporate tax returns for CTD, despite the fact that Rowlette's signature appears at the bottom of the returns. Rowlette did not have the skills to prepare the returns; Harman did. (Gov't Exhs. D, E and F).

17. Harman first learned that CTD had tax problems in early 1983. For example, CTD did not pay its first quarter payroll taxes until August 1983. (Gov't's Exh. B at 7).

18. Harman did not have access to CTD's checkbook at all times. As Rowlette became increasingly "closed-door" about CTD's operations during the latter part of 1983, the checkbook would disappear into Rowlette's office for days at a time. However, in October 1983, Harman signed corporate checks for items such as expenses and his own salary knowing CTD's payroll taxes were due and owing.

19. Harman may have first apprised Fowler of CTD's tax problem as early as the summer of 1983. Harman knew that EF owned CTD and he felt the officers in EF should know that a tax problem existed. Harman suspected that Rowlette was not paying CTD's payroll taxes because he had not seen checks timely paid to this effect.

20. Starting in the summer of 1983 through early 1984, Harman apprised Fowler of CTD's tax problem about six times. Harman looked to Fowler and Merritt to help with CTD's tax problem because he felt that Rowlette lacked the managerial skills necessary to solve CTD's financial problems. (Gov't's Exh. H). When EF advanced monies to CTD in November and December 1983, Harman believed the purpose of these advances was to pay CTD's taxes.

21. CTD continuously overdrafted its corporate bank account some $8,000 to $10,000 during the periods at issue.

22. In late 1983 through early 1984, Rowlette repeatedly authorized Harman to issue corporate checks in round figures, not accounting for payroll taxes owed by CTD. Harman consequently had to "gross-up" salary checks paid in round figures to properly reflect CTD's unpaid payroll taxes. (Plaintiffs' Exh. 13).

23. Fowler and Harman initially had a good working relationship, one of mutual respect and loyalty. However, during the periods at issue, this relationship deteriorated.

24. Harman knew he might be held personally liable for CTD's taxes. Harman resigned from CTD at the end of February 1984. (Gov't's Exh. G). However, he continued to provide controller services to DM, EF and VR. Harman and Fowler had a "falling out" around September 1985. Harman subsequently resigned as controller from DM, EF and VR.

### E. Sharon K. Fowler.

25. The United States stipulated at the pretrial conference that Sharon K. Fowler is entitled to a pro-rata share of the overpayment to the extent she contributed to that amount. For the 1982 tax year, Robert and Sharon Fowler received a refund of $33,-161.19. (Gov't's Exh. L at 8). Sharon K. Fowler contributed $1,486.30 in withholding.

### F. The Assessment and Payment Process.

26. The IRS assessed Fowler in March 1988 the full amount of CTD's unpaid payroll taxes. Fowler made payments through 1988 totalling over $11,000. (Gov't's Exhs. K, L, and N).

27. The IRS assessed Harman for the full amount of CTD's unpaid payroll taxes in 1987. Harman paid installments of $200 each month through January 1990. (Gov't's Exh. EE). Harman received a letter from the IRS in January 1990 telling him to discontinue payments and that he had overpaid $3,600. Harman subsequently received a refund plus interest. (Gov't's Exhs. J, N; 3-Party Defendant's Exh. A3).

28. The IRS assesses 100% of the "penalty" against *any* person it believes is a responsible person who willfully withholds payroll taxes. 26 U.S.C. §§ 6201, 6203, 6671 and 6672(a); Treas.Reg. §§ 301.6201–1(a), 301.-6203–1, 301.6671–1, 301.6672–1. The purpose of Section 6672 is "to encourage the timely and prompt payment of withholding and other taxes collected by any [responsible] person not primarily liable for the tax, and to insure the ultimate collection of taxes from such

person." 441–2nd *Tax Management Portfolio,* at 108 (10/21/91).

29. As the IRS receives payments, from whomever, it credits the deficient corporate account. Once the penalty is fully paid, the IRS notifies all persons concerned that the account is closed. The IRS then determines which persons overpaid and therefore may be entitled to a refund (Plaintiffs' Exh. 1). *See* CCH, Internal Revenue Manual §§ 5638.11 ("Abatement of a 100–Percent Penalty"), 5638.12 ("Adjustment of a 100–Percent Penalty"), 5638.4 ("Refunds"). The IRS apparently makes no effort to administrate the penalty against potentially liable officers and directors in an equitable or fair manner. The IRS collects money as it is paid, without reference to who pays or what amount is paid.

30. When plaintiffs filed this lawsuit, a Mr. Steve G. Fuerth from the Department of Justice ordered the IRS to reverse credits the IRS had granted previously to Harman and Fowler. (Unmarked Exhibit, Letter dated October 2, 1992). Mary Koritnik, the IRS agent who supervised Harman's and Fowler's payments, reversed the credits on orders from Fuerth without notifying either Harman or Fowler.

### Conclusions of Law

#### G. Controlling Law.

31. In *Muck v. United States,* 791 F.Supp. 817, 819–820 (D.Colo.1992), the court concisely summarized the law regarding 26 U.S.C. § 6672:

> Every employer who pays wages must deduct and withhold federal taxes and deposit those funds into a trust account for the benefit of the United States. 26 U.S.C. § 3402. A willful failure to collect, account for and pay over such taxes will result in imposition of a penalty equal to the amounts withheld against the "responsible person." 26 U.S.C. § 6672(a).
>
> The IRS must establish two elements before it imposes personal liability for unpaid withholding taxes: (1) the individual to be penalized must be responsible for the collection and payment of the tax; and, (2) the failure to comply must be willful. *Jay*

*v. United States,* 865 F.2d 1175, 1178 (10th Cir.1989).

> Factors to be considered in determining responsibility include:
>
> (1) the duties of the officer as outlined by the corporate by-laws; (2) the ability of the individual to sign checks of the corporation; (3) the identity of the officers, directors and shareholders of the corporation; (4) the identity of the individuals who hired and fired employees; (5) the identity of the individuals who were in control of the financial affairs of the corporation. *Id.*
>
> More than one person may be held responsible for payment of a corporation's wage withholding taxes.

*Mussato v. United States,* 50 AFTR2d 82–5428, 1982 WL 1658 (D.Colo.1982). Personal liability for the underpaid taxes will attach to those within the corporation who have both the power and the responsibility to order the taxes paid. *Monday v. United States,* 421 F.2d 1210, 1214 (7th Cir. 1970).

Willfulness does not require a showing of evil intent or motive. *Burden v. United States,* 486 F.2d 302, 304 (10th Cir.1973). Rather, "an act which is voluntary, conscious and intentional, as opposed to 'accidental' is sufficient." *Id.* Payment to creditors other than the IRS, when the payor knows withholding taxes are delinquent, is sufficient to establish willfulness. *Id.*

*Id. See also Raba v. United States,* 977 F.2d 941, 943–46 (5th Cir.1992) ("responsible person" defined broadly and turns on whether person had the effective power to pay taxes; willfulness turns on responsible person's knowledge that taxes are due).

#### H. Burden of Proof.

32. An assessment under Section 6672 is presumed correct and the person(s) assessed has the burden of proving that he or she was not a responsible person and that his or her failure to pay over withholding taxes was not willful. *See e.g., Fidelity Bank, N.A. v. United States,* 616 F.2d 1181, 1186 (10th Cir.1980).

33. The burden of proof not only encompasses the burden of producing evidence, but also entails the "risk of non-persuasion." *Id.*

## I. Robert G. Fowler's Liability.

■ 34. Fowler was a "responsible person" as defined in the statute and the case law. Fowler had the effective power and ability to pay taxes owed by CTD because of the intimate financial relationship between DM, EF and CTD. Fowler's companies financed CTD during the period in issue by transferring funds to CTD at Fowler's directive.

35. Fowler had significant control over the disbursement of corporate funds. (Gov't's Exh. O). He and Rowlette met to discuss how CTD's operating capital would be spent. CTD depended on outside sources of capital from companies such as DM and EF because CTD made little money on its own, if any. (Gov't's Exh. M). Fowler was instrumental in hiring and firing Rowlette.

36. Fowler was not an officer or director of CTD nor could he sign checks on CTD's behalf. DM, EF and CTD kept separate books, filed separate taxes and were publicly funded. However, these facts are outweighed by the close working relationship between the officers and directors of DM, EF, VR and CTD;[1] the fact that CTD depended on DM, ER, and VR for financial sustenance; and, Fowler's ultimate ability to hire and fire people such as Rowlette.

■ 37. Fowler, however, did not act willfully in failing to pay over the withheld taxes of CTD's employees. Willful conduct may include a responsible person's failure to investigate or to correct mismanagement after having noticed that taxes have not been

properly remitted. *See Hartman v. United States,* 538 F.2d 1336, 1341 (8th Cir.1976). A responsible taxpayer may be liable because he was aware of delinquent taxes yet acquiesced in the corporation's continued payment to other creditors. *McDonald v. United States,* 939 F.2d 916, 919 (11th Cir.1991). Willfulness is also present if the responsible person knows of the delinquency and then fails to rectify it. *Gephart v. United States,* 818 F.2d 469, 475 (6th Cir.1987).[2]

■ 38. This Court finds that Fowler did not fail to investigate or correct Rowlette's mismanagement, did not acquiesce in CTD's failure to pay, and did not fail to rectify CTD's problems. In fact, Fowler did what he could as head of CTD's parent company to financially assist CTD and Rowlette. As CEO of CTD's parent company, Fowler was entitled to reasonably rely on Rowlette's representations regarding CTD's financial status to a point. This point included November and December of 1983. It was Rowlette, not Fowler, who authorized Harman to pay expenses other than the CTD's tax deficiency in November and December 1983. (Gov't's Exh. B at 12–14). At that time, Fowler had advanced monies to CTD with the understanding between himself and Rowlette that Rowlette would apply the money properly to CTD's tax deficiencies. Fowler and Rowlette had operated successfully under such understandings earlier in the year, and Fowler had no reason to expect that Rowlette would not follow through in November and December of 1983. Thus, while it is true Fowler controlled DM's and EF's purse-strings, and thereby directed cash advances to CTD during this period, he did not, nor could he, control or direct Rowlette's (CTD's) decision to pay other expenses instead of CTD's tax deficiency.

This Court reasons that the case at bar draws the fine line between what courts consider "negligent" and what courts consider "willful" under § 6672. Section 6672 is *not* a strict liability statute, although after reviewing the case law, one might believe otherwise. This Court is persuaded that Fowler, as head of CTD's parent company, did what he could to insure that CTD paid its taxes. *Cf. Denbo,* at 1031, 1034 (director of closely-held corporation "disregarded a known risk" when he relied on the assurances of the closely-held corporation's president "instead of doing more").

---

1. Government did not argue at trial that CTD was the alter ego of either DM or EF.

2. The Court observes that the current interpretation of the § 6672 legal standard leaves precious little room for negligence. However, it is well-settled in the case law that a responsible person is not liable for a corporation's taxes if he acts negligently as opposed to willfully. *See e.g., Denbo v. United States,* 988 F.2d 1029, 1034 (10th Cir.1993) (Tenth Circuit cites to many of the same cases cited in ¶ 37 of this order).

39. Rowlette was a brilliant engineer whose dipsomania ruined his career and his life. Rowlette's alcoholism created serious interpersonal problems between Rowlette and Fowler, and Rowlette and Harman during the time period at issue. It was not coincidental that CTD's tax woes ripened as Rowlette's alcoholism increased through late 1983 and early 1984.

40. The evidence adduced does not suggest that Fowler directed payments to creditors other than the IRS knowing withholding taxes were delinquent. However, it is certain Rowlette so directed, especially in November and December of 1983. *Burden v. United States*, 486 F.2d 302, 304 (10th Cir. 1973). Rowlette's alcoholism was a degenerative type of addiction and this Court cannot say that Fowler should have known of the seriousness of Rowlette's problem in late 1983. At best, Fowler's actions could be characterized as negligent because, arguably, he might have suspected that Rowlette's alcoholism would lead to some future mismanagement of CTD's funds. For these reasons, Fowler is not personally liable to the IRS for CTD's payroll taxes because he did not satisfy the "willfulness" prong of the § 6672 test.

## J. Danny R. Harman's Liability.

■ 41. Harman was not a responsible person who willfully failed to pay CTD's payroll taxes. Harman simply did not have the authority to control CTD's financial affairs. (Gov't's Exh. O). For example, Harman protested when Rowlette told him to issue checks in round figures, not accounting for payroll taxes owed by CTD. Harman consequently had to "gross-up" salary checks paid in round figures to properly reflect CTD's unpaid payroll taxes. Harman most likely would not have issued checks in round figures to begin with had he been in control, if only to save himself from liability.

42. On several occasions, Harman made both Fowler and, to the extent he could, Rowlette aware of CTD's tax problems. Harman's supervisors apparently assured him that CTD's tax problems would be resolved. The Court finds Harman's role in CTD is analogous to that of the comptroller in *Jay v. United States*. In *Jay*, the comp-troller's authority to pay bills was circumscribed by the corporation's president who instructed the comptroller not to pay the government. 865 F.2d 1175, 1179 (10th Cir. 1989).

## K. Sharon K. Fowler.

43. For the 1982 tax year, Robert G. Fowler and Sharon K. Fowler received a refund of $33,161.19. Sharon K. Fowler contributed $1,486.30 in withholding and, therefore, Sharon K. Fowler has received the money she contributed to CTD's withholding.

## L. Problems Highlighted By This Case.

44. In *Carter v. United States*, the federal district court observed that Section 6672 is a "harsh" statute. 717 F.Supp. 188, 191 (S.D.N.Y.1989). The *Carter* court stated:

> Pursuant to [section 6672], the government may assess a penalty, equal to the full amount of the unpaid tax, against a person responsible for paying over the money who willfully fails to do so. This section reflects "a congressional judgment that because amounts withheld from employees salaries are 'treated as a trust fund ... persons responsible for their paying over should be individually liable, as well as the corporation for their diversion.'" (citations omitted). This section may only be utilized where the tax cannot be collected from the corporation itself. (citation omitted). Courts have recognized that "[t]he statute is harsh, but the danger against which it is directed—that of failing to pay over money withheld from employees until it is too late, because the company has gone broke—is an acute one against which, perhaps, only harsh measures are availing." (citations omitted).

*Id.* The case at bar is the type contemplated by the quoted language in *Carter*. However, a "harsh" measure need not be an arbitrary one. This Court heard extensive testimony by IRS agents which suggested that current procedures used by the IRS for collection pursuant to § 6672 may be arbitrary in two ways: (a) inefficiencies resulting from chronic overpayments, and (b) unfairness resulting from a conflict between the collection procedure itself and the case law.

45. *Chronic overpayments:* The collection procedure employed by the IRS pursuant to § 6672 induces the persons assessed to chronically overpay and is therefore highly inefficient. Both Fowler and Harman overpaid in the instant case, and the IRS had to refund what Fowler and Harman overpaid with interest. Internal Revenue agent Robert Varra testified that the IRS does nothing to assist the persons assessed regarding equitably dividing the penalty. The parties are left to fend among themselves. Overpayments result because the persons assessed either do not contact each other or cannot contact each other because they do not know who, if anyone else, the IRS assessed.

46. Chronic overpayments are inefficient for at least two reasons. First, they cause the IRS to incur increased interest expenses and administrative costs. The IRS has to refund overpayments with interest; plus, each overpayment is accompanied by more administrative costs. (Gov't's Exhs. I, J, K and L). If the IRS could decrease the amounts overpaid, a concomitant decrease in interest expenses and administrative costs would follow. In other words, the administrative costs associated with moving an overpaid dollar from the person assessed to the IRS then back again to the person assessed appear to be considerable. (Gov't's Exh. P). The IRS should attempt to leave a dollar which ultimately should end up in the hands of the person assessed with that person whenever possible.

47. Second, chronic overpayment takes away useful money from the persons assessed. The $3,600 overpaid by Harman in this case is probably not an atypical amount. Multiply this amount by any number of § 6672 cases the IRS works on every year and it becomes apparent that the IRS's current collection method takes a substantial amount of money out of the hands of the persons assessed and gives it to the IRS, if only temporarily. This Court notes that persons assessed pursuant to § 6672 typically are either bankrupt or have fallen upon hard times. If the persons assessed were able to keep monies otherwise overcollected, they could pay off creditors more quickly. Undoubtedly, in the case at bar, both Harman and Fowler could have used their overpayments to pay off creditors earlier. Instead, the IRS overcollected the penalty, deprived both Harman and Fowler the use of what sums it overcollected, and then had to pay back both Harman and Fowler with interest.

48. The IRS appears to be in the best position to coordinate an equitable division of the corporate penalty among those assessed. It is the entity with the best information regarding the nature and scope of the tax penalty. The IRS could minimize overpayments by better monitoring who paid and how much has been paid. The costs associated with this increased monitoring are probably marginal because the IRS keeps a detailed accounting of each § 6672 account anyway. (Gov't's Exhs. N, P)

49. *Unfairness:* The IRS's § 6672 collection method works an unfairness on the persons assessed and engenders litigation because it conflicts with the case law. In the instant case, the IRS first assessed Harman, though it appears Fowler ended up paying more toward CTD's penalty than Harman paid. Fowler paid more to the IRS not because he was more responsible or acted more willfully than Harman, but because the IRS accounts for the penalty payments in what amounts to a "pay as much as you can when you can" basis. Making any one corporate officer or director pay more than another for no apparent reason directly conflicts with court-made law which attempts to apportion the tax penalty according to who was responsible and who acted willfully. More importantly, the assessment procedure invariably engenders litigation among the persons assessed and the IRS because the collection procedure does not encourage an equitable division of the penalty among the persons assessed. *See specifically* CCH, Internal Revenue Manual § 5638.4 ("Refunds").

50. Such inefficiency and unfairness is easily remedied. Congress should consider an accounting procedure which equitably affects and accurately records how much each assessed person pays. Any procedure which forces the IRS to better anticipate gross overpayments and assist the persons assessed in apportioning the tax penalty would be a welcome improvement. The goals of the

new procedure should be to minimize the amounts overpaid by those persons assessed and to minimize litigation.

51. Next, this Court notes that the Department of Justice retains too much power in the area of tax credits and abatements. In the instant case, as a result of this lawsuit, Mr. Steve G. Fuerth from the Department of Justice ordered the IRS to reverse credits the IRS previously had granted Harman and Fowler. Mary Koritnik, the IRS agent who supervised Harman's and Fowler's payments, reversed the tax credits because Fuerth ordered her to, without notifying either Harman or Fowler. Such an action at best offends fundamental notions of due process, particularly the notice requirement. At worst, this Court cannot allow the government to argue, on one hand, that Harman may not invoke the so-called "Nuremburg" or "following orders" defense when, on the other hand, IRS agent Koritnik testified that she was only following Steve Fuerth's orders, and that she had 'no idea' why Fuerth ordered her to reverse the tax credits on Fowler's and Harman's penalty accounts.

52. Finally, the evidence adduced at trial strongly supported the finding that Rowlette was the person responsible for willfully withholding CTD's taxes. The IRS failed by not more thoroughly assessing CTD's financial status in February 1984, and by not more carefully monitoring CTD's status thereafter. (Gov't's Exh. H). No doubt, such failure finds its roots in the fact that the IRS could later assess 100% of CTD's tax penalty against any person it believed was "responsible." This Court reasons that the IRS may not later recover the tax penalty from persons who were not both responsible and willful under § 6672 where the IRS failed to assess the truly culpable party in a timely fashion, i.e., Rowlette or Rowlette's estate.

THEREFORE, IT IS

**ORDERED** that the IRS fully refund to Robert G. Fowler and Danny R. Harman monies assessed as tax penalties pursuant to 26 U.S.C. § 6672. Such refunds shall include interest from the date the IRS collected the penalties or portions of the penalties.

**ORDERED** that, as a result, this Court need not rule as to whether Harman's assessment, subsequently abated pursuant to 26 U.S.C. § 6404(a), was "reassessed" after the statute of limitations period expired.